## SCHOOL DISTRICT NO. 3, IN THE COUNTY OF CARBON, v. THE WESTERN TUBE CO.

COURTS—AMENDMENT OF RECORD—ENTRY OF FINDINGS NUNC PRO
TUNC—EVIDENCE TO AUTHORIZE AMENDMENT OF RECORD AFTER
TERM — APPEAL AND ERROR — JUDGMENT WITHOUT FINDINGS —
SCHOOL DISTRICTS — WARRANTS — CONTRACTS — POWER OF SCHOOL
DISTRICTS TO INCUR DEBTS—LIMITATION ON INDEBTEDNESS—ACT OF
CONGRESS OF JULY 30, 1886—POWER OF DISTRICT BOARD—RATIFICA-
TION BY DISTRICT OF ACTS OF BOARD—JUDGMENT AGAINST SCHOOL
DISTRICT.

1. It is competent for the court at any time to amend its record
that it may conform to the truth and actual facts of the
case.

2. Where, through an error or misprision of the clerk, the findings made and filed in a cause have been omitted from the journal, the court may after the term order that they be entered *nunc pro tunc* as of the date when they should have been entered.

3. Where a judgment rendered July 13, 1899, recited that it was rendered upon findings entered December 21, 1896, and, upon the hearing of a motion filed by plaintiff July 1, 1903, for a *nunc pro tunc* entry of the findings, it appeared from evidence furnished by the record that the findings had in fact been made, signed by the judge and filed December 21, 1896, but had been omitted from the journal through the error, misprision and omission of the clerk, and, though the original written findings had been lost from the files, the contents thereof were shown by a copy set out in the bill of exceptions which had been allowed and signed before judgment and filed in the cause, and there was no controversy as to the contents; *Held,* that such findings were properly ordered to be entered *nunc pro tunc* as of December 21, 1896, the date when they were in fact made and filed.

4. Upon a motion for the *nunc pro tunc* entry of findings alleged to have been omitted from the journal through the error and misprision of the clerk, the bill of exceptions allowed and signed by the trial judge and filed in the cause reciting as a fact the rendering of decision and the filing of findings on a date stated, and setting the same out at length, was competent evidence that the findings had in fact been made and filed at the time stated, and was sufficient evidence to authorize an amendment of the record, after judgment and after the term, by ordering the findings to be entered *nunc pro tunc.*

5. An appeal from an order directing the *nunc pro tunc* entry of findings alleged to have been omitted from the journal through the error and misprision of the clerk, does not bring up for review alleged errors in the rulings on the trial of the cause itself or in the findings or judgment.

6. There must be a final judgment to authorize a proceeding in error; such a proceeding does not lie upon a verdict or mere findings.

7. The rendition of a judgment without a finding to support it is not void, although written findings may have been timely requested; it is a mere irregularity or error for which the judgment may be vacated or reversed upon proper proceedings for that purpose.

8. The irregularity or error, if any, in rendering a judgment upon findings not entered, though in fact made and filed, is cured by a subsequent order for the entry of such findings *nunc pro tunc* as of the proper date before judgment; and the objection that judgment was rendered without findings is not thereafter available to the complaining party where he made no motion to vacate the judgment, nor instituted proceedings in error for its reversal on that ground until after the *nunc pro tunc* order.

9. The question is discussed, but left undecided, whether the *nunc pro tunc* entry of findings upon which a judgment had been rendered required the statutory period for taking proceedings in error for the review of the judgment to be computed from the date of the *nunc pro tunc* order instead of the date of the judgment.

10. A school district warrant against which there is no other valid objection is not rendered invalid by the failure of the clerk to number it and note its issuance in his warrant stubbook, notwithstanding the official custom to number the district warrants consecutively.

11. A school district warrant properly signed, and bearing the corporate seal of the district, is *prima facie* evidence of its validity.

12. A school district warrant is not rendered invalid by the mere omission from the minutes of the district board of a record of the presentation, audit and allowance of the claim for which it was issued, and an order for its issuance.

13. A school district warrant sued on was signed by the proper officers, and indorsed by the treasurer, showing its presentation to him and its non-payment for want of funds. The warrant was issued in payment for heating equipment for a school house duly furnished and accepted, under a contract therefor, authorized by the district board, which provided for the issuance of warrants to pay for the same in accordance with a vote of the board to that effect, and three payments had been made upon the warrant by the treasurer with district money. *Held,* that, in the absence of a contrary showing, it would be presumed from the facts aforesaid that the warrant was regularly ordered issued, and the mere omission of such a direction from the minutes of the board's proceedings is not sufficient to overcome that presumption.

14. As against the defense that a school district warrant sued on was issued in excess of the authorized debt limit of the district, the presumption of validity attaches to the war-

rant regularly issued until the contrary is satisfactorily established.

15. The burden of proof is upon a defendant school district to establish its averment in defense of a suit upon its warrant that the same is void as a debt incurred in excess of the authorized debt limit; it is not the plaintiff's duty to show the contrary in the first instance.

16. The power of municipal corporations, counties and other subdivisions in the territories to become indebted was limited by the act of Congress of July 30, 1886, to four per centum on the value of the taxable property therein respectively to be ascertained by the last assessment for territorial and county taxes previous to the incurring of such indebtedness. To pay for a school house heating plant contracted for August 25, 1886, defendant school district on October 30, 1886, issued the warrant sued on. The statute required railroad and telegraph property situated in more than one county to be assessed by the Territorial Board of Equalization upon a valuation per mile, the same to be certified to the county authorities, and the regular taxes levied thereon by the County Board. Certain taxable railroad and telegraph property was admitted to have been situated within the district in 1886, regularly assessed by the Territorial Board, certified to the county authorities, placed on the tax list, and territorial, county and school taxes levied thereon. The regular assessment roll as returned by the assessor and equalized by the County Board did not include such railroad and telegraph assessment, and it was admitted that neither the County Clerk nor Commissioners, as required by law, apportioned such last named assessment among the several school districts, though the actual mileage within the district was also admitted, as well as the value per mile as assessed by the Territorial Board. *Held,*

(1) The act of Congress aforesaid was not a grant of power to incur indebtedness, but was a limitation upon such power.

(2) It was incumbent on the defendant district alleging the warrant in suit to be void as issued in violation of said act to prove the value of the taxable property in the district as shown by the last assessment for territorial and county taxes, which duty would not be complied with by proof of a confessedly partial assessment of such property.

(3) Such defense would not be established by proof merely of the value of the taxable property on the roll returned by the County Assessor, it being admitted that it did not include railroad and telegraph property located in the district which had been separately assessed by the Territorial Board as aforesaid.

(4) It was not error prejudicial to the district to admit in evidence the assessed value of such railroad and telegraph property, notwithstanding the omission of the proper county authorities to apportion the assessment among the several school districts; since, without such proof, the value of all the taxable property would admittedly be not shown, and, therefore, there would be no basis for holding the warrant void under the act aforesaid.

(5) Admitting the existence of a valuable class of taxable property whose value was not disclosed, its value would be presumed sufficient to bring the debt within the limitation of the act of Congress.

(6) Conceding, *arguendo*, that the assessment of 1885 was the proper test rather than that for 1886, the debt would be presumed to be valid, there being no showing as to the assessment for the former year.

(7) The date of the contract obligating the district must be regarded as the date when the debt was incurred, within the intent of the act, although the warrant in suit was not issued until afterwards.

(8) The railroad and telegraph assessment was properly considered in determining the value of the taxable property in the district, notwithstanding the omission of the clerk and commissioners to apportion such assessment among the several proper school districts, the assessment being otherwise unobjectionable, and there being no showing that the taxes thereon were not paid.

(9) Debts incurred subsequent to the date of the contract obligating the district were properly excluded in determining the existing indebtedness of the district.

(10) A special tax of $1,500 voted for contingent expenses by the annual school district meeting in

May, 1886, might have been anticipated by the District Board in making the contract, as its collection would not occur until later in the year; and such sum was entitled to be deducted from the amount of existing indebtedness, in determining the power to become indebted.

(11) A balance remaining in the teacher's fund might have been available by transfer to the school house fund, if found necessary and ordered by the board, to use in paying for the heating plant contracted for.

17. The only recognized school district funds under the statutes as they existed in 1886 were the school house fund and the teachers' fund.

18. Special taxes voted by a school district in 1886 for contingent expenses, or for any purpose other than to supply a deficiency in the teachers' fund, became, when collected and turned over to the district, a part of the school house fund, though kept separate by the district officers in what was called the "contingent fund," no such fund being authorized by law.

19. A school district debt for a school house heating plant is properly payable from the school house fund, though a warrant therefor was drawn against "contingent fund," the latter being a fund not recognized by law; and such warrant should be treated as drawn against the proper fund for its payment.

20. The authorized delegation of all the powers of the annual school district meeting to the District Board would empower the latter to sell and dispose of unused and abandoned school property and direct the application of the proceeds, and where there was property of that nature worth $2,200, a balance of $1,383.36 in the teachers' fund presumably intact when the contract in question was made, and transferable by the board to school house fund, and a special tax to be subsequently collected of $1,500, as against $1,149 of outstanding warrants, there would have been the sum of $3,934.36 of possible available funds out of which to pay the contracted indebtedness of August 25, 1886, amounting to $2,650. Therefore, *held*, that the objection that the contract was void as involving an expenditure beyond the appropriation for that purpose was not upon the facts well taken.

21. The fact that, subsequent to the contract alleged to have been void as in excess of available funds, the board bought

furniture for the school house cannot operate to avoid the contract for the heating plant under which the warrant in suit was issued.

22. In the absence of any provision of law prohibiting a school district from contracting a debt in excess of the revenue or taxes for the current year, it has authority to incur a reasonable debt for a legitimate and necessary purpose; and where a new school building had been erected at a cost of $25,000 under express legislative authority, its equipment with a steam heating plant at a cost of $2,650 was neither an unreasonable nor extravagant expenditure.

23. A school district having erected a new school building at a cost of $25,000 under express legislative authority, it had power to provide a steam heating plant therefor costing $2,650, and, as incident to such power, it had power to incur the debt for such plant, the same being reasonable, and there being no provision of law prohibiting such debt, either expressly or by necessary implication; and the District Board became vested with the complete power of the district in the premises under the authorized delegation of the powers of the latter to the board by vote of the district electors at the annual meeting.

24. The building committee appointed by legislative act to supervise the erection of the school house having asked for separate bids for the heating plant in their advertisement for bids for the construction of the building, and received thereunder the bid of the party to whom the contract for heating plant was afterward awarded by the board, such advertisement was a sufficient compliance with the general statute requiring the board to advertise for bids for any repairs, addition or improvements to school property costing more than $200; so that it was not incumbent on the board to again advertise for bids.

25. Where a school district might originally have authorized the incurring of a debt in the purchase of equipment for a school house, it may ratify such debt when incurred by the District Board; and the action taken at the regular annual meeting in 1890 of defendant school district in voting a special tax of $2,000 for contingent expenses, and expressly voting that $1,000 thereof should be applied upon existing indebtedness, amounted to a ratification of the debt sued on which had been incurred by the board in 1886, no other existing indebtedness at the date of such meeting being disclosed, except bonded indebtedness which was otherwise provided for.

26. The fact that school district property cannot be reached or sold on execution does not prevent the rendition of a general judgment against the district upon a valid debt.

27. A general judgment may be rendered against a school district upon a valid warrant of the district payable from the school house fund, which is a continuous fund, and is capable of being replenished when temporarily exhausted by a transfer from another regular fund or by annual taxation.

[Decided March 28, 1905.]                    (80 Pac., 155.)

Error to the District Court, Carbon County.

This was an action brought by the Western Tube Company upon a warrant issued by School District No. 3, in the County of Carbon, October 30, 1886. The case came to this court on error from a judgment in favor of the plaintiff, and to review an order entering the findings in the cause *nunc pro tunc*. The facts are stated in the opinion.

*McMicken & Blydenburgh*, for plaintiff in error.

The *nunc pro tunc* order was improperly made. The evidence fails to disclose that any order was originally made to enter the findings; no intention of it is to be found in the judge's docket nor in the appearance docket, nor was any record of the findings made by the trial judge or in any record required to be kept. (Hudson v. Hudson, 20 Ala., 364.) The findings take the place of a verdict and the latter cannot be supplied by a *nunc pro tunc* order. (1 Black. on Judgments, 133.) And where there is no judgment on the record the court cannot at a subsequent term order a judgment entered *nunc pro tunc;* if the record does not show that a judgment was rendered, it cannot be supplied at a subsequent term. (Gray v. Thomas, 12 S. & M., 111; Jennings v. Ashley, 5 Ark., 128; North v. Pepper, 20 Wend., 677; Kissam v. Hamilton, 20 How. Pr., 375.) If the parties have been guilty of laches in applying for a *nunc pro tunc* order, such order should not be entered. (1 Black. on Judgments, 129.) The presumption is that the

clerk did his duty, and he was not required to enter anything without the payment of costs; there is no evidence that any money was tendered to pay for entering the findings. (Laws 1890-91, Chap. 53, Secs. 7, 8, 9.)

The judgment of July 13, 1899, is not valid and should not have been made, for the reasons: (1) No findings or conclusions had been entered as recited in the judgment; and no findings having been entered, they could not be reviewed on a writ of error. (2) No general judgment could be rendered in this cause. The warrant was drawn upon a particular fund to which the plaintiff must be required to look for payment. The judgment, if any, therefore, in favor of the plaintiff should have been that the money be paid out of the contingent fund upon which it was drawn. (Campbell v. Court, 76 Mo., 57; Pettis County v. Kingsbury, 17 Mo., 479; Moody v. Cass County, 74 Mo., 307; Kingsbury v. Pettis County, 48 Mo., 207; Boro v. Phillips County, 4 Dill., 216; McCullough v. Brooklyn, 23 Wend., 458; Tippecanoe County v. Cox, 6 Ind., 403; People v. Wood, 71 N. Y., 371; Caylor v. Rochester, 12 Wend., 165; Argenti v. San Francisco, 16 Cal., 255; Martin v. San Francisco, id., 285; Lake v. Williamsburgh, 4 Denio, 520.) The statute prescribes no method for collecting a general judgment against a school district. The only power given the district to raise any money is given to the electors at the annual meeting. It is against public policy to allow the levy of a general fund against school district property; and, while mandamus proceedings are allowed to compel certain municipalities to levy a tax for the payment of a judgment, such municipalities have had the power to levy such a tax. A school district, however, has no power to levy such a tax without a vote of the electors, except in the case of bonds provided for by statute to pay which the County Commissioners may levy a tax. Such power is not given to the County Commissioners to pay a judgment against a school district. Again, a school district has no power to contract a debt for which a judgment might be rendered in excess of

the revenues for the current year.    (School Dist. v. Western Tube Co., 5 Wyo., 185.)

As the findings were not in fact entered of record until after the rendition of judgment, the running of the statute limiting the time for proceedings in error upon the judgment did not commence until the date of the actual entry of the findings.    Such findings could not have been reviewed until they had been entered.    (Spencer v. Troutt (Cal.), 65 Pac., 1083; 1 Black on Judgments, 136; Borer v. Chapman, 119 U. S., 587.)    We claim, therefore, that even if the *nunc pro tunc* order was proper the entire proceedings may now be reviewed.

The warrant sued upon should not have been admitted in evidence, because it was alleged to have been drawn upon the "contingent" fund, while on its face it appeared to have been drawn upon the "court" fund.    The court erred in overruling the defendant's motion to strike out the evidence respecting the conduct of the building committee; this being a suit upon a school warrant of the district and it being immaterial whether the building committee proceeded to construct the school house or not.    The fact that the building committee had advertised for bids was immaterial, since it was admitted that the school district board had not advertised for the heating apparatus, as required by statute.    (Sec. 8, Chap. 93, Laws 1886.)    And it was not until June 7, 1886, after the advertisement of the building committee, that the trustees attempted to give any power to the committee to let the contract for heating apparatus.    Moreover, the committee was acting not under the authority of the board, but by virtue of a legislative act.    The proceedings of the district board at the adjourned meeting June 7, 1886, were improperly admitted, for the reason that the trustees were without authority to give any power to the building committee.    (School Dist. v. Western Tube Co., 5 Wyo., 185.)    The following matters were improperly admitted in evidence, namely:    the fact that the school district owned property or had money outside of the contingent fund; the

assessed valuation of the railroad and telegraph property for the year 1886, for the reason that the County Commissioners had not divided and adjusted the mileage between the several districts and caused the amounts of such assessment to be entered and placed in the list of taxable property returned by the several assessors. Hence, there was no assessment of such property in 1886 and no record from which it could be ascertained. The court erred in striking out the evidence as to the purchase of furniture which had occurred prior to the issuance of the warrant sued on; because this action is not brought on the contract for the heating plant, or on *quantum meruit*, but upon the warrant. It was, therefore, especially material to show the indebtedness of the school district in order to determine its power to become indebted under the congressional limitation, as well as in respect to the presence of available funds.

A plaintiff suing upon a warrant must show that the law has been strictly complied with in the issuance of the same. All matters connected with such warrant should be of record and must be proved thereby. (Township v. Ryan, 86 Pa. St., 459; Hubbard v. Lyndon, 28 Wis., 674; School Dist. v. Blakeslee, 13 Conn., 227; Sherwin v. Bugbee, 17 Vt., 337; Jordan v. School Dist., 38 Mo., 164; Commrs. v. Chitwood, 8 Ind., 504; Trustees v. Osborne, 9 Ind., 458; Archer v. Commrs., 3 Blackf., 501; El Dorado v. Reed, 11 Cal., 130; Campbell v. Breckenridge, 8 Blackf., 47; Potts v. Henderson, 2 Ind., 327; Crumps v. Supervisors, 52 Miss., 107.) There was no attempt in this case to prove that any motion for the issuance of the warrant was made at any meeting of the board, hence there was no showing that the omissions in the record was the result of mistake. The burden is upon the plaintiff to prove the validity of the warrant when it is attacked and to prove that the proper action was taken when the records are silent, and when it was shown by them that no meeting was had at the date of the warrant. The warrant being drawn upon the contingent fund was but an assignment of that fund, and to it

the holder must look for payment. (Clemson v. Davidson, 5 Binn., 392; Wiggins v. McDonald, 18 Cal., 126; Mc-Williams v. Webb, 32 Ia., 577; Garsney v. Gardner, 49 Me., 167; Spiker v. Nylegger, 30 Md., 315; Jordan v. Gillen, 44 N. H., 424; Noyes v. Brown, 33 Vt., 431; Shannon v. Hoboken, 37 N. J. Eq., 123; Thompson v. Emery, 7 Fost., 269; L. & M. Co. v. Marsh, 91 Pa. St., 96; Clark v. Muran, 3 Paige, 373; McClellan v. Walker, 26 Me., 114; Newby v. Hill, 2 Metc., 530; Richardson v. Rust, 9 Paige, 243; Conway v. Cutting, 51 N. H., 407; Walker v. Mauro, 18 Mo., 564; Spain v. Hamilton, 1 Wall., 604; Binn v. Pierce, 20 Vt., 25.)

The school board had no authority to either enter into a contract for the heating apparatus or issue the warrant sued upon, as decided in the case when here before from a former judgment, and the other evidence introduced upon the last trial is not sufficient to alter the situation. In dealing with school districts, all parties must take knowledge of their powers and their want of power. School warrants are not negotiable paper. There could be no ratification .by the district of the void act of the board.

*John W. Lacey,* for defendant in error.

There was no proof of laches on the part of the plaintiff below in making its application for a correction of the record. The *nunc pro tunc* order for the entry of the findings in order to make the record speak the truth as to such findings was proper. (Gross v. Sloan, 58 Ill. App., 302; Freeman v. Morris, 44 N. Car., 287; Wollfolk v. Gunn, 45 Ga., 117; Wade v. Bryant (Ky.), 7 S. W., 397.) Every court has a right to judge of its own records and minutes; and if it appear satisfactory that an order was actually made at a former term and omitted to be entered by the clerk, it may at any time direct such order to be entered as of the term when it was made. (Benedict v. State, 44 O. St., 679; Kaufman v. Shain, 111 Cal., 16; Burnett v. State, 14 Tex., 455; School Dist. v. Bishop, 46 Neb., 850; Frink

v. Frink, 43 N. H., 508; Weed v. Weed, 25 Conn., 337.) The
evidence in this case was sufficient to show the fact that
the findings had been actually made and filed and was suf-
ficient to authorize the making of the *nunc pro tunc* order.
(Sullivan v. Eddy, 154 Ill., 199; Johnson v. Moore, 112
Ind., 91; Freeman on Judgments (3d Ed.), Sec. 63.) The
evidence consisted of admissions in the answer of the
plaintiff in error as well as its admissions upon the trial,
and the bill of exceptions; from all of which it clearly
appeared what the findings were and that they had been
made December 21, 1886, as alleged in the motion for the
*nunc pro tunc* order.

The findings having actually been made by the court
before the rendition of the judgment, it was the actual
findings, and not the spreading of them upon the journal,
which authorized the judgment.   But as they were sub-
sequently entered as of the date when actually made, the
judgment is abundantly supported by findings.  (1 Black
on Judgments, 136.)   The school district is a corporation
with power to sue and be sued; to make contracts and incur
obligations; and hence a judgment may be rendered against
as well as for it.   (R. S. 1899, Secs. 529, 540, 546.)

There are but two funds of the school district, namely:
the teachers' fund and the school house fund.   (R. S. 1899,
Secs. 566, 567.)   And while these funds are distinct for
the purpose of keeping accounts, they are not separate in
any sense that neither can be used for paying demands
upon the other, but, on the contrary, any surplus in either
fund may be transferred to the other.   (Id., Sec. 534.)
Therefore, when the ends of justice require it, it is the
duty of the district authorities to make the transfer, and
the courts will act upon it as though made.

The railroad property was actually within the boundary
of the school district, was actually assessed, and the assess-
ment put upon the records of the county; and the taxes
were paid to the school district.   The congressional act
limiting the indebtedness of the district had relation solely

to the actual property within the district and the valuation of the property as found upon the assessment rolls. The school district was not authorized to make an assessment; that was made by the county authorities. In this case there was such a valuation fixed in accordance with law, showing the actual valuation of the property within the district as determined by its assessment for taxes by the only authorities authorized to assess it, and such as would bring the indebtedness incurred within the statutory limit. Moreover, the contract which created the obligation sued on was made before the enactment of the federal statute. And, therefore, such statute does not apply. (State v. Hopkins, 44 Pac., 134.)

Proofs of the acts of a school district board may be shown outside of the records; the rights of creditors or third persons cannot be prejudiced by the neglect of the board to keep proper minutes. (1 Dillon Mun. Corp., Secs. 237, 300; Bank v. Dandridge, 12 Wheat., 64; Bridgford v. Tuscumbia, 16 Fed., 910; Westerhaven v. Clive, 5 O., 136; Town v. Rucker (La.), 31 So., 629; Barton v. Pittsburg, 4 Brewst., 373; Poweshiek v. Ross, 9 Ia., 511; Athern v. Dist., 33 Ia., 105.)

The petition in error is too late to authorize a review of the original judgment, which was rendered more than the statutory period for taking appeals prior to the time when the proceeding in error in this case was brought. The plaintiff in error might have brought error upon the judgment notwithstanding the failure of the clerk to enter the findings. If it was true that there were no findings of fact to authorize or support the judgment that would not prevent the bringing of the proceeding in error within the statutory period. It cannot be successfully contended that the judgment is weaker with the findings of fact actually entered than it was with no such entry. A proceeding in error is not authorized upon findings, but it must be based upon a judgment. (R. S. 1899, Secs. 4249, 4262.) The correction allowed by the *nunc pro tunc* findings was not a cor-

rection of the judgment itself, nor did the *nunc pro tunc* order in any wise change the judgment. The time, therefore, for appealing from the judgment commenced at the date of its rendition. (Leadbetter v. Laird, 45 Wis., 522; Agassiz v. Kelleher (Wash.), 39 Pac., 228; S. & L. Society v. Horton, 63 Cal., 310; Joyce v. Dickey (Ind.), 3 N. E., 252; Snyder v. James, 2 Wyo., 252.) This court is, therefore, without jurisdiction to inquire into the regularity of the original judgment or any matter upon which it was based, because such judgment was rendered and entered more than two years prior to the commencement of proceedings in error.

Potter, Justice.

1. The first question to be considered arises upon exceptions to the action of the District Court in ordering the findings to be entered *nunc pro tunc* as of the date when they were alleged to have been made, signed and filed.

Some time prior to December 21, 1896, this action was tried without a jury in the District Court of Carbon County, Judge Knight presiding. On July 1, 1899, Judge Craig having succeeded Judge Knight as presiding judge of said court, an order was entered in the cause reciting that the cause had been heard by Judge Knight at a former term, who had made special findings of fact and law, but that no judgment had been entered upon the findings, and the cause remained in the court for final disposition, and that the present judge, having been of counsel for plaintiff in the cause, was disqualified. It was, therefore, ordered that Judge Bramel of the Second Judicial District be called upon to render judgment on the findings theretofore made in the cause, and such other order in the premises as might be deemed fit and proper.

On July 13, 1899, Judge Bramel presiding, judgment was entered in the cause in favor of the plaintiff and against the defendant for the sum of $3,439.58, with interest at the rate of eight per cent per annum from December 21, 1896,

and costs; the judgment reciting that it was rendered upon the findings entered in the action December 21, 1896.

On July 1, 1903, the plaintiff filed its motion in said court, alleging that on December 21, 1896, the court duly made, reduced to writing, signed, entered of record and filed in said cause its findings, said findings being set out at length in the motion, and further alleging that by reason of the error, misprision and omission of the clerk, said findings were not entered upon the usual journal of the court; that they were made in the form of a separate pamphlet or booklet filed only in said cause, and that said pamphlet or booklet had become lost and destroyed, although filed, and that complete evidence of the fact that said findings and conclusions were so made and of the contents thereof, was still preserved 'in writing in the files of the cause. ﹙ The relief prayed by the motion was that the findings and conclusions as made be entered *nunc pro tunc* and spread at large upon the proper court journal. Notice of the motion was duly given the adverse party, who filed an answer thereto.

The answer admitted the trial of the cause, and denied that the findings as set out in the motion had been duly made, reduced to writing, signed, entered of record or filed, admitting, however, that among the papers in the cause there had been a pamphlet or booklet containing the statement of findings set out in the motion, but averring that neither the clerk's docket or the court journal mentioned the filing of the same.

The answer further averred that the cause was tried to the court October 29, 1895, and, at the conclusion of the evidence and arguments, counsel for defendant below requested a separate statement in writing of conclusions of fact and law, with a view of excepting thereto; that the trial judge then intimated what his decision would be and requested counsel for the plaintiff to prepare the findings in accordance with the intimation given, and present them to the court; that the judge also intimated that when so

prepared they would be entered, but, upon the suggestion of defendant's counsel, agreed that they would not be entered so late in the term as to prevent a motion for new trial before adjournment; that late in the term the judge received the prepared findings, and informed defendant's counsel that he was ready to render judgment; that on counsel protesting that it would be too late to examine the findings and prepare motion for new trial before adjournment of the term, the judge handed the pamphlet to the clerk of the court, remarking, "We will keep this until a future time," or words of that import, and also handed a copy to defendant's counsel. It was further averred in the answer that at a subsequent term, on December 21, 1896, the judge called up the matter and requested the clerk to hand him the pamphlet of the findings, in which, after some calculation, the figures, formerly inserted with lead pencil, were changed to comply with the date December 21, 1896, and inserted in ink, and the pamphlet then returned to the clerk, but that counsel did not recall that any order was then made, although on the same day defendant filed a motion for new trial, which was denied without argument, and requested time to reduce exceptions to writing. It was admitted that the judge doubtless intended at the time mentioned to enter the findings and render judgment, but averred that no such order was made in express terms; that, assuming the findings to have been entered, and that judgment had been rendered, defendant's counsel prepared a bill of exceptions, including therein a copy of the said findings, and that the bill was afterward presented to the court, and after having been submitted to plaintiff's counsel and returned without objection, was signed by the judge; that it was not discovered until after that time by defendant's counsel that the findings had not been entered and no judgment rendered. The answer was verified by the counsel for defendant.

Judge Knight having in the meantime resigned the office of District Judge to accept the office of justice of this court,

and his successor being disqualified to hear the motion, having been of counsel in the cause, Judge Scott of the First District was called in to preside at the hearing. On that hearing the bill of exceptions that had been prepared by defendant's counsel and filed in the cause was admitted in evidence and also the entries in the clerk's appearance docket. The docket contained no entry showing the filing of the findings or any order for entering them. But the bill of exceptions signed by Judge Knight, who had tried the cause, recited that, on December 21, 1896, "the court did in open court render its decision and did file its conclusions of fact separately from its conclusions of law, which decision and conclusions are in words and figures as follows, to-wit:" which recital was followed by a complete statement of conclusions of fact and law, showing the same to have been signed by the judge, and to have concluded with the following: "That upon the issues joined the plaintiff is entitled to judgment against the defendant in the sum of three thousand four hundred and thirty-nine and 58/100 dollars."

It was admitted on the hearing that the findings had not been entered on the court journal, and that on said 21st day of December, 1896, in open court, the judge called up the cause, obtained the pamphlet of the findings, made computations therein as to the amount found due to the plaintiff, entered said amounts in said findings, and, when computed, handed them in open court to the clerk; and that, when so handed to the clerk, they were in pamphlet form and duly signed by the judge, and were in the words and figures as set forth in the plaintiff's application for the entry of such findings *nunc pro tunc*. On behalf of defendant, the affidavits attached to the answer were introduced in evidence.

The court found upon the evidence that on the date aforesaid the findings had been duly made, reduced to writing, signed and filed in the cause, and that by the error, misprision and omission of the clerk, were not entered upon the journal, and that complete evidence of such findings was preserved in writing in the files and records of the cause.

And it was ordered that they be entered and spread at large upon the journal as and for the 21st day of December, 1896.

If the findings were in truth and in fact made and filed by the court at the time alleged, and they were omitted from the journal through an error or misprision of the clerk, there can be no doubt of the power of the court to supply the omission by an order after the term that they be entered *nunc pro tunc* as of the date when they should have been entered, as it is competent for the court at any time to amend its record that it may conform to the truth and actual facts of the case. (11 Cyc., 764, 765; 17 Ency. Pl. & Pr., 920; 1 Black on Judgments, Secs. 154-156; Ins. Co. v. Boon, 95 U. S., 117.) The rule is stated in Black on Judgments as follows:

"As regards mere clerical errors, mistakes arising from inadvertance, or formal misprisions of clerks or other officers, it is always in the power of the court, even after the adjournment of the term, to make such corrections or amendments as truth requires." (Sec. 155.) "If anything has been omitted from the judgment which is necessarily or properly a part of it, and which was intended and understood to be a part of it, but failed to be incorporated in it through the negligence or inadvertence of the court or the clerk, then the omission may be supplied by an amendment after the term." (Sec. 156.)

The court say, in Gagnon v. U. S., 193 U. S., 451, that "the power to amend its records, to correct mistakes of the clerk or other officer of the court, inadvertencies of counsel, or to supply defects or omissions in the record, is inherent in courts of justice." (See also *In re* Wight, 134 U. S., 136.)

In the leading case on this subject in California, it was said: "Every court of record has the inherent right and power to cause its acts and proceedings to be correctly set forth in its records. The clerk is but an instrument and assistant of the court, whose duty it is to make a correct memorial of its orders and directions; and whenever it is properly brought to the knowledge of the court that the

record made by the clerk does not correctly show the order or direction which was in fact made by the court at the time it was given, the authority of the court to cause its records to be corrected in accordance with the facts is undoubted." (Kaufman v. Shain, 111 Cal., 16 (43 Pac., 393.)

The decided cases in the various states furnish numerous illustrations of the application of this rule. A reference to them seems hardly necessary, as the rule is so well settled and its limitations so clearly defined. But we will briefly notice a few. In People v. Ward, 141 Cal., 628 (75 Pac., 306), the record in 1899 of a judgment sentencing a defendant to imprisonment in the state penitentiary was amended in 1901 by a *nunc pro tunc* order so as to correctly recite the judgment actually pronounced. In Territory v. Clayton, 8 Mont., 1 (19 Pac., 293), the record of a criminal trial was amended so as to make it show the fact that defendant had entered a plea of not guilty. In Woolfolk v. Gunn, 45 Ga., 117, a verdict that had actually been returned, but not entered, although judgment had been rendered thereon, was ordered to be enterd *nunc pro tunc,* so as to accord with the facts; and the court said: "The truth of a case ought always to appear on the record," and, "Hardly any limit can be put to the power of a court to amend its own records so as to make it tell the truth as to what actually transpired." In Gross v. Sloan, 58 Ill. App., 302, a record was amended so as to show the true verdict; the appellate court in sustaining the order of the lower court saying: "The court did not attempt to correct or amend a verdict. It in this regard merely directed its clerk to record the verdict which was given, and which should have been recorded by the clerk at the time of its rendition." In Johnson v. Moore, 112 Ind., 91, it was held that a paper containing a calculation made by the judge who tried the case, and which was certified by him to have been filed and treated as a paper in the case, was such a memorandum of record as authorized a *nunc pro tunc* entry correcting the recorded amount of the judgment. In Sullivan v. Eddy,

154 Ill., 199, the bill of exceptions was held a competent record by reference to which the record of certain prior proceedings in the cause could be amended.

In Insurance Co. v. Boon, 95 U. S., 117, a *nunc pro tunc* order was held proper causing special findings to be entered as of a day of the preceding term, upon which judgment had been entered at such term; the order having been based upon an opinion of the trial judge stating his conclusions which had been filed concurrently with the entry of judgment.

In a Nebraska case it was held improper after judgment for the court to make a new special finding, and one that conflicted with the former general findings, but the court recognized the authority to supply defects and omissions in the record, and it was said: "If it had been made to appear that the court, in announcing its judgment, had in fact made a special finding, * * * then it would have been proper, even after judgment, by such an order to incorporate that finding into the record." (Wachsmuth v. Orient Ins. Co., 49 Neb., 590.) And in Minnesota it was held that a trial court has jurisdiction, even after appeal from a judgment, until the return is transmitted to the appellate court, to correct mistakes and omissions in its findings, so as to make them conform to the decision actually made. (State, &c., Mfg. Co. v. Adams, 47 Minn., 399. See also Martin v. Bank, 7 S. Dak., 263; North v. Peters, 138 U. S., 271.)

In several of the states the rule observed respecting the character of evidence proper to be considered on an application after term to amend a record by correcting mistakes or supplying omissions is rather strict, it being held that the correction or amendment can be based only upon some matter of record, or some written memorandum or minute of the transaction appearing in the case which clearly show what actually occurred; while in others a more liberal rule prevails, and the amendment is permitted upon any evidence of satisfactory weight and character clearly establishing the fact and terms of the record. (1 Black on Judg., 165; 17 Ency. Pl. & Pr., 928-931; 11 Cyc., 765.)

We need not here determine which rule is the sounder or more reasonable, since it is evident that, though the stricter rule should be adopted, it was not violated in this case. There was no controversy concerning the substance of the findings; the only contention was whether they had in fact been made. Upon that point the bill of exceptions was competent evidence which was a paper of record in the cause, signed by the trial judge, and filed, having been prepared by defendant's counsel, and examined by plaintiff's counsel.

After stating that the cause had been tried on the 29th day of October, 1895, submitted to the court and taken under advisement, the bill recited as a fact the rendering of decision and the filing of conclusions of fact and law on the date alleged, which conclusions and findings are set out in the bill at length. The motion for new trial does not seem to have been separately offered in evidence, but the bill recites its filing on December 21, 1896, and that motion as set out in the bill alleges as grounds for new trial, among other matters, error in certain findings of fact and conclusions of law.

Were there nothing else, this would seem amply sufficient evidence to authorize the amendment of the record so as to make it speak the truth and correctly set forth the action and decision of the court. It was, however admitted that on the date in question the court did in fact obtain from the clerk the pamphlet containing the findings; that the case was called up, and computations of the amount due up to that time made and inserted in the findings, and that the same were then signed or had previously been signed by the judge and were returned to the clerk. This occurred in open court at a time when the case was under consideration. The fact that a copy of the findings had been previously furnished counsel reasonably explains the failure, on the occasion referred to, to read or announce the findings orally, and sufficiently accounts for the absence of oral directions, if it is to be understood that no such oral directions were then given.

The understanding and intention of court and counsel is definitely shown by the filing of the motion for new trial, the denial thereof, the granting of time to reduce exceptions to writing, and the subsequent presentation, allowance, signing and filing of the bill of exceptions.

There was, therefore, record evidence of high character amply justifying the court in concluding that the findings as alleged were made and filed December 21, 1896, and that they should have been entered in the journal as of that day; and that their omission therefrom was the result of the error, misprision and omission of the clerk.

Without deciding what might be the effect, if any, of the laches of a party in making an application to supply an omission in the record, we find no evidence of lack of diligence on the part of the moving party. There is nothing to show when such party first discovered the omission, and no facts are disclosed showing unreasonable delay after such discovery in filing the application.

We conclude, therefore, that the order directing the findings to be entered *nunc pro tunc* was not an improper exercise of judicial power. New findings were not made, nor was any change made in the findings. They were merely caused to be entered as of the date when actually rendered and filed. It follows that the order directing that the findings be entered *nunc pro tunc* was proper, and hence will be affirmed.

2. The above would dispose of the case here unless plaintiff in error is right in its contention that the entire proceedings are properly before us for review, including the judgment of July, 1899, and the errors alleged to have entered into it. Counsel for defendant in error strongly insist that as these proceedings in error were not begun within the period allowed by statute after the date of the judgment of 1899, there is no authority for reviewing that judgment, or considering any exceptions thereto or to the findings upon which it was based.

Clearly the proceedings in 1903 for the amendment of the record did not involve the merits of the main contro-

versy, and the appeal from the order directing the entry of the findings *nunc pro tunc* does not bring up for review any alleged errors in the rulings on the main trial of the cause, or in the findings or judgment. The single matter determined in that proceeding was the question presented by the motion, viz: whether the findings alleged to have been made and filed in 1896 should be ordered entered as of the date when so made and filed, in consequence of their omission from the journal through the fault of the clerk.

But it was doubtless intended to predicate this proceeding in error upon the judgment of 1899, as well as upon the order of 1903. The petition in error charges in effect that such judgment was erroneously rendered upon findings which had not in fact been made and filed, and also assigns errors in the findings, as well as error alleged to have occurred on the trial of the cause; and it was probably intended to assign such errors in support of the prayer for the reversal of the judgment, though the petition in error is subject to some doubt in that respect.

It may be doubtful also whether it is proper by the single petition in error to seek the reversal of both the *nunc pro tunc* order and the preceding judgment. But as no such point was urged by counsel, and a decision of the question is not deemed necessary to a disposition of the cause, it has not been considered.

We may presume that if the judgment itself had been omitted from the journal, and its entry had been supplied by the *nunc pro tunc* order, the period for instituting proceedings in error for its review would have commenced to run from the date of the *nunc pro tunc* order. But the order supplied the omission of the findings upon which the judgment was confessedly based, and not the judgment itself, and thus a somewhat different question is presented.

It is fundamental that a proceeding in error does not lie upon a verdict or mere findings. There must be a final judgment before a proceeding in error is authorized. The proceeding must be taken from a judgment or final order.

If the date of the judgment in question is to be deemed the commencement of the period allowed for instituting a proceeding in error for its review, or a review of the errors assigned upon the findings, then the time therefor had expired, as the petition in error was not filed until May 24, 1904, and the statute in force in 1899 required such proceedings to be commenced within two years after the rendition of the judgment, which period was reduced to one year by the act of February 13, 1901, with a provision for an extension not exceeding eighteen months. (R. S. 1899, Sec. 4262; Laws 1901, Ch. 28, Sec. 1.)

It may be proper to regard the judgment as it stood prior to the *nunc pro tunc* order as a judgment without findings, although it recited the previous entry of findings. At least, there were no findings on the journal. But no complaint on that ground is now available to plaintiff in error. The rendition of a judgment without a finding to support it is not void, although written findings may have been timely requested. It constitutes merely an irregularity or error, for which the judgment may be vacated or reversed upon proper proceedings for that purpose. (Railroad v. Douglas Co., 18 Kan., 169; Crisfield v. Neel, 36 Kan., 278; Doty v. Sumner, 12 Neb., 378; Petalka v. Fitle, 33 Neb., 756; Gordon v. Little, 41 Neb., 250; Hennesy v. Tacoma S. & R. Co. (Wash.), 74 Pac., 584; State ex rel. v. Huston, 72 id., 1015; Kent v. Common Council, 90 App. Div. (N. Y.), 553; Sommer v. Sommer, 87 id., 434; Prondzinski v. Garbutt, 9 N. Dak., 239; Gurner v. State ex rel., 28 Kan., 790; 1 Black on Judg., Sec. 185; Bank v. Milwaukee W. Mills, 84 Wis., 23.)

No motion was made to vacate the judgment for the want of findings, nor was any proceeding instituted for its reversal on that ground prior to the present proceedings; and it is evident that the irregularity or error was cured by the *nunc pro tunc* order.

In determining whether a proceeding in error has been brought within the period allowed by statute, the date of

the judgment is ordinarily a controlling factor. But the important question upon the facts here is whether the entry of the findings as of a date prior to the judgment by the *nunc pro tunc* order so changed the situation as to require the date of that order to be regarded as the date of the judgment, within the intent of the statute limiting the time for appellate proceedings; and upon this question there seems to be no direct authority.

Where a judgment actually entered has been subsequently corrected, amended or modified by a *nunc pro tunc* order, we understand it to be generally held that if the amendment has not materially changed the character of the judgment the period of limitation runs from the date of the original entry; and in Snyder v. James, 2 Wyo., 250, the modification of a judgment by consent reducing the amount of recovery was held not to enlarge the statutory time for commencing a proceeding to reverse the judgment. There are, however, numerous decisions to the effect that upon a material *nunc pro tunc* amendment of the judgment the time for appeal runs from the date of the order directing the amendment. But in the ·case at bar the judgment was not, in terms at least, or by any direct reference, either corrected, amended or modified. Still it might seem that the *nunc pro tunc* entry of the findings did in effect cause the judgment itself, as well as the antecedent record, to speak the truth in respect to the findings upon which it was founded; and for the first time the findings were identified upon the record.

It, therefore, occurs to us that the pertinent question may be whether the judgment in its present condition was a completed and perfected judgment until the making of the *nunc pro tunc* order. It was manifestly a judgment before then, and bound the parties to the same extent as any other judgment. But had it become a perfected judgment so as to permit of a review of any error that might be alleged to have entered into the findings, prior to their entry?

It is true that the judgment might have been reviewed for the alleged error that it was not supported by any findings upon the record; and it is also true that the plaintiff in error, had it seen fit to do so, might have applied for a *nunc pro tunc* order entering the findings, and then, within the statutory period, have instituted proceedings for the reversal of the judgment upon the ground of the errors now assigned. But not having done so, is it reasonable to conclude that the right to have said alleged errors examined by an appellate court has been waived? Perhaps had a reversal of the judgment been sought without an entry of the findings, upon the ground that it was unsupported by the evidence and law of the case, it might have been considered as based upon a general finding, but the record would not have disclosed any special findings either of fact or law.

In People ex rel. v. Circuit Judge, 34 Mich., 62, which was a case in ejectment, where under the statute a second trial was permissible as a matter of right upon an application within a prescribed period, an additional finding was filed after judgment, and the question arose as to the date from which the period for such application would run. Chief Justice Cooley, in the opinion, said: "If for any reason of inadvertence or otherwise the judgment is entered up before the findings are filed, or if the findings are defective and are afterwards corrected, we are of the opinion that the judgment so entered up previously is to be regarded as in the nature of provisional action, which only becomes perfected when the findings are completed, and that the time for taking a new trial as a matter of right should date from the day when judgment could have been taken on the completed findings." The remarks of the learned judge are suggestive, although they had reference to a different state of facts than exist in this case.

It is true that a record amended *nunc pro tunc* stands as though it had never been defective, or as if the entries had been made at the proper time (17 Ency. Pl. & Pr., 933),

nevertheless the findings were not properly on the record until the *nunc pro tunc* order, and it may be seriously questioned whether before that time there had been an opportunity to seek a review of the judgment on any ground controlled by the findings.

While it appears to us that there are strong grounds for holding that, for the purpose of presenting the exceptions taken upon the findings, the statutory period commenced to run only from the date of the *nunc pro tunc* order, we feel that the question is not free from doubt; and we prefer to leave the matter undecided, since we are satisfied that there is no reasonable ground for reversal upon the merits.

3.  The action is brought upon a warrant of the school district appearing on its face to have been regularly issued, admitted to have been signed by the director and clerk of the school board and presented to the treasurer, who endorsed upon it at said presentation, "Presented for payment and not paid for want of funds—Interest 8 per cent (eight) from date until paid.  Frank Blake, Treasurer."  The warrant bears date October 30, 1886, is directed to the treasurer of the district and requires that officer to pay to A. L. Strang Co., or order, $2,650 out of contingent fund on account of heating apparatus for said district.  The school board was composed of the three persons who were respectively director, clerk and treasurer; "director" being the title given by statute to the presiding officer.  The warrant in due course came into the hands of the plaintiff below, defendant in error here.

The petition, among other things, alleges that on the 30th day of October, 1886, the defendant school district was justly and lawfully indebted to the A. L. Strang Company for a steam heating apparatus for the public school building in said district, before that time sold and delivered to the defendant at its special instance and request; and that on said date said indebtedness amounted to $2,650, and was then due and payable, and the said claim had in due

form been presented for payment to the trustees at a regular meeting thereof, and according to law audited and allowed and ordered paid, and that by an order of record the board ordered that an order be drawn on the treasurer for the said amount, and that the order in regular and proper form was thereafter drawn on the date aforesaid. Certain payments are alleged to have been thereafter made, and these payments were admitted on the trial to have been made, viz: February 24, 1887, $206.92; January 30, 1888, $249.54; January 16, 1889, $750. The other allegations of the petition are unimportant upon the questions involved.

The answer, in addition to containing a specific denial of several of the allegations, including the allegation of indebtedness, the presentation, audit and allowance of the claim, sets up as a second defense that the defendant was not authorized to incur any indebtedness for the purposes and in the manner alleged in the petition; that no tax had been ordered levied by the defendant district to raise money for the purpose of supplying a steam heating apparatus for the public school building, or to pay the alleged school warrant; and that there was no money in the district treasury applicable to the payment of said alleged indebtedness. For a third defense it was alleged that the indebtedness was in excess of the congressional limitation then in force upon the power of the district to incur indebtedness, and was for that reason void.

The case was here several years ago on error from a former judgment, which was reversed and the cause remanded for new trial. (School Dist. v. Western Tube Co., 5 Wyo., 185.) The new trial occurred as has already appeared in the discussion of preliminary questions in 1895, resulting in a judgment for the plaintiff for the amount due at the date thereof. The last trial was had largely upon an agreed statement of facts, each party reserving the right to object to the competency, materiality or relevancy of such facts; and it is evident that some facts were then introduced into the case which were absent when

it was here upon the first judgment. This is particularly true in respect to the allegations of the third defense, and to some extent we think as to the second defense.

It is admitted that the warrant sued on was signed by the regular director and clerk of the district, that it bears the endorsement of the treasurer above set out upon the back thereof, and that the payments above mentioned were made by the treasurer of the district out of moneys of the district in his hands at or about the times shown by the endorsement of such payments upon the warrant. The admission of the warrant in evidence was, however, objected to by defendant for the absence of a showing that it was issued by authority of the board, or that the statutory re-quirements as to presentation, auditing and allowance had been complied with. An exception was taken to the over-ruling of the objection. In this connection it was admitted that before the execution and delivery of the warrant the steam heating apparatus had been delivered and placed in the building; that it had previously been contracted for by the board, at the request of the building committee, to be referred to in a later part of the opinion, and that in said contract, and by order of the school board entered upon its minutes prior to the making of the contract, the board agreed to issue the warrants of the district in payment for said steam heating apparatus; and it was also admitted that the minutes of the meetings and proceedings of said school board contain no entry of the presentation of the claim, nor any entry ordering or directing the issuing of the warrant sued upon, except as otherwise appearing in the agreed statement; and, further, that the warrant in ques-tion contains no number, although it was the official custom of the board to number warrants consecutively, and the war-rants issued before and after the one in suit are consecu-tively numbered, without leaving any gap which could apply to this warrant; and that the warrant stub book contains no memorandum or reference to it.

Upon the above mentioned facts in relation to the issu-ance of the warrant, the conclusion of law of the trial court

was as follows: "The school warrant being properly signed and bearing the corporate seal of the defendant is *prima facie* evidence of its validity, and this evidence is not overcome by merely showing that no mention of any direction for its issuance is made in the records of the school district when such showing is not accompanied by evidence tending to show that it in fact was not ordered issued, and especially when the warrant in its amount and terms complies with the terms of the agreement for the purchase of the steam heating apparatus, and when it is admitted that such heating apparatus was delivered and placed in the school building before the issuance of the warrant. The validity of the warrant is not affected by the mere failure of the officers of the defendant to make suitable minutes of the proceedings relating to its issuance."

That conclusion is challenged by the plaintiff in error, but we think that it correctly states the law upon the agreed facts. There is no claim of fraud, nor that the warrant was issued upon inadequate consideration; and it is not perceived, if it was otherwise valid, how the failure of the clerk to number it, and note its issuance in his warrant stub book, could be reasonably held to render it invalid in the hands of the party who honestly received it under his contract with the board, nor why such party should suffer for such an omission of the district officers, even if he had been aware of their custom in issuing other warrants, which is not shown.

The chief contention in this connection, however, is based upon the omission from the minutes of the board of a record of the presentation of the claim, its audit and allowance, and an order for the issuance of the warrant. It is not shown that the claim was not in fact presented at a proper board meeting, audited and allowed, nor that the warrant was not in fact ordered to be issued. The argument is that the omission of these facts from the minutes of the meeting of the board renders the warrant invalid. We are unable to agree with that proposition.

In Commissioners v. Stone, 7 Wyo., 280, in reference to the failure of the record of the meetings of County Commissioners to show certain acts of the board, it was said: "It is clear that the board cannot avoid liability for its official acts by the failure of the proper officer to record its proceedings as required by law, and we think the weight of authority in such cases is that when there is an entire omission to make any record of the particular proceeding, it may be established by parol evidence." And in Decker v. School Dist., 74 S. W., 390, it was held by the Court of Appeals of Missouri that the failure of a school board to make and preserve minutes of their proceedings at a meeting will not affect the rights of a party with whom they have made a valid settlement at such meeting.

The contention that it was incumbent upon the plaintiff to show that all the prerequisite steps to the issuance of a valid warrant or order upon the treasurer had been duly taken cannot be sustained. The board of trustees of a school district were then, as they are now, expressly authorized to audit and allow all just claims against the district, and draw an order for all demands thus audited on the district treasurer. (R. S. 1887, Sec. 3941; R. S. 1899, Sec. 546.) And in this respect we observe no reason for any distinction between the warrants of a school district and county warrants, which are held to constitute a *prima facie* cause of action, whose impeachment must come from the defendant. (Appel v. State ex rel., 9 Wyo., 187.)

Now, the warrant is signed by two of the three trustees, and it is endorsed by the other trustee, showing its presentment to him as treasurer and its non-payment for want of funds. At a meeting of the board in June, 1886, the board authorized a contract for the heating apparatus and voted to issue district warrants to pay for the same, and the contract entered into by them in August, 1886, contains an agreement to that effect. The heating apparatus was duly furnished and accepted, and three payments were made by the treasurer upon the warrant with district money. Upon

these facts it is to be presumed, in the absence of a contrary showing, that the warrant was regularly ordered issued; and the mere omission of such a direction from the minutes of the board's proceedings is not sufficient to overcome that presumption.

4. One of the grounds, if not the principal one, for reversing the former judgment was that the debt represented by the warrant sued on had been contracted in excess of the permissible debt limit of the district. Wyoming was under territorial government when the debt was incurred and for four years thereafter; and by act of Congress of July 30, 1886, the power of municipal corporations, counties and other subdivisions in the territories to become indebted was limited to four per centum on the value of the taxable property within such corporation, county or subdivision, to be ascertained by the last assessment for territorial and county taxes previous to the incurring of such indebtedness. (U. S. Stat., 49th Congress (1st Sess.), Ch. 818, p. 171, Sec. 4; Rev. Stat. Wyo., 1887, p. 39.)

The record in the former case exhibited a taxable valuation of property in the district of only $479.115, while, at the time the debt in suit was incurred, the then existing indebtedness of more than $25,000 itself exceeded the four per cent limitation based upon the above valuation. Upon the second trial, however, the record of which is now before us, it was shown by the agreed statement of facts that the value aforesaid of the taxable property represented merely the property upon the regular assessment roll as returned by the county assessor and equalized by the county board, and did not include the taxable value of certain railroad and telegraph property within the district, which was assessed as required by law by the Territorial Board of Equalization. (R. S. 1887, Secs. 3839-3842.) It was agreed that eighty-four miles of the Union Pacific railroad and 168 miles of the Western Union telegraph line were located in the county, and twenty-five miles of the railroad and fifty miles of the telegraph line were located in the

school district; that such railroad and telegraph line were for the year 1886 regularly assessed by the Territorial Board of Equalization—the railroad at $9,646 per mile and the telegraph line at $75 per mile; that such assessment was duly certified to the county authorities on August 16, 1886, and the same was duly placed on the county tax list, and the territorial, county and school district taxes for the year were levied by the county board upon all the taxable property in the county, inclusive of the said railroad and telegraph property; and that among such taxes so levied were the following: 2 mills on each dollar of valuation for the support of common schools; and in the said school district a special bond tax of 1½ mills on the dollar and a special district school tax of 2¼ mills on the dollar, besides a poll tax of two dollars on the persons required by law. But it was further admitted that neither the County Commission-· ers nor clerk, in that year, apportioned or distributed the railroad and telegraph assessment among the several school districts in which the railroad and telegraph line were located.

It thus appears that if it be proper to examine such assessment of railroad and telegraph property, in connection with the admitted fact as to the number of miles in the district, there would be added to the taxable valuation of the district for railroad property $241,150 and for telegraph $3,750, making an aggregate valuation of $724,015, sufficient, as will be hereafter shown, to prevent the debt in suit with the then other existing indebtedness of the district from exceeding the congressional limitation. The trial court upon the agreed facts found the value of the taxable property to be the sum of $724,015 aforesaid. And it is evident that the railroad and telegraph assessment is competent to be examined in ascertaining the value of the taxable property, unless it is rendered incompetent by reason of the failure of the County Commissioners or clerk to adjust and divide the mileage among the proper school districts.

The plaintiff in error, defendant below, tendered an objection to the admission relating to the railroad and telegraph assessment on the special ground of the absence of such adjustment of mileage by the clerk or commissioners. The objection was overruled, and that ruling, as well as the findings in reference to the taxable value, are here assigned as error.

Suppose it to be assumed that it was error to admit in evidence, or to consider such assessment, would the plaintiff in error be in any better position? This is not a suit to test the validity of the assessment or of the taxes thereon levied, nor does it appear that the same were ever questioned in a proper proceeding for that purpose. The assessment is relevant only as a guide in ascertaining the taxable value of property within the district, to determine the alleged invalidity of the indebtedness sued on.

The warrant sued on is presumptively valid. The defendant alleged it to be void as a debt incurred in violation of the congressional prohibition. The proof of that defense devolved upon the defendant, and it was not incumbent on the plaintiff to establish the contrary in the first instance. If, therefore, the facts relating to the railroad and telegraph assessment be eliminated, the case will stand thus: Upon the other agreed facts the assessment roll prepared by the county assessor showed a taxable valuation of $479,115. The property on that roll did not include the railroad or telegraph line, although it was admitted that a certain number of miles thereof extended through the county and were located within the school district. Hence the proof would show the one assessment roll to be but a partial assessment of the taxable property of the district, and that a valuable class of property excluded therefrom was located in the district, and there would be no proof of its taxable value.

In that condition of the case it appears to us that the defendant would have utterly failed to establish its defense in a very material matter. Could the district be permitted to confessedly prove a partial assessment, and cast the

burden upon the warrant holder of proving a sufficient additional assessment to validate the debt? Clearly, we think not. Suppose the roll of the assessor had admittedly included only personal property, or nothing but real property, would its introduction upon such a state of facts have proven anything to avoid the debt? Now, in the present case, the taxable value of one class of existing taxable property required by law to be assessed by others than the assessor would not be shown, unless the agreed facts as to that assessment are to be considered. It must be remembered that the presumption of validity attaches to the warrant until the contrary is satisfactorily established. (Coffin v. Board, 114 Fed., 518; Board v. Irvine, 126 Fed., 689.)

The act of Congress aforesaid was not a grant of power to incur indebtedness; it was a limitation upon such power. It assumed the power to become indebted, and limited the extent of the power. (Board v. Hall Lith. Co., 8 Okla., 378 (58 Pac., 620); Board v. Rowden, 8 Okla., 406 (58 Pac., 624); Hoffman v. Com'rs., 41 Pac., 566; McMurtry v. Com'rs., 55 Pac., 1069; Childs v. City (Wash.), 32 Pac., 217.) In the cases cited it was held that a newly created county or municipal corporation might become indebted in advance of any assessment by which the value of the taxable property could be ascertained.

In Board v. Irvine, 126 Fed., 689, decided by the United States Court of Appeals, Eighth Circuit, it was said in the opinion by Circuit Judge Thayer: "In the absence of an assessment fixing the taxable value of county property for the purpose of taxation, it is obvious that the burden of showing an over issue of warrants—a burden which rested upon the appellant—was not one that could be easily discharged, since an assessment for the purpose of taxation, regularly made, was the only proper test by which to determine when the debt-contracting power of the county became exhausted, and all debts that were contracted before an assessment was made were presumptively valid." And the court there held that it was the duty of the county

to show what the taxable value of county property was; and that the duty had not been discharged "with any degree of certainty" so as to invalidate the warrants.

Conceding, therefore, that the objection as to the competency of the railroad and telegraph assessment was well taken, it would follow that the taxable value of the district property was not shown, and hence there would be no basis for holding the warrant void under the congressional enactment, and the admission of the assessment and the findings thereon could not be held prejudicial error; since it must be evident that admitting the existence of a valuable class of taxable property whose value is not disclosed, it would be properly presumed that its value was sufficient to bring the debt within the limitation.

The same reasoning would apply to the objection that the assessment of 1885, rather than 1886, was the proper test, as no showing whatever was made with reference to that assessment. But, although the warrant was issued October 30, 1886, the contract obligating the district was made August 25, 1886, which must be regarded as the date when the debt was incurred within the intent of the limitation statute; and prior to that date the assessment of the railroad and telegraph property had been made, and the result transmitted to the county authorities, and under the statute in force it would seem that the regular county assessment should also have been completed, and there is no showing to the contrary.

We are inclined, however, to hold that the railroad and telegraph assessment was properly considered. Its value per mile had been duly and regularly assessed, and that assessment duly and regularly returned to the county authorities as provided by law. It was duly placed on the tax list, and territorial, county and school district taxes levied upon its valuation. Although the County Clerk and commissioners did not designate the number of miles located in each school district, it is not shown that some other officer, such as the collector or assessor, did not do so,

although such duty did not devolve upon such other officers; and it is not shown that the taxes were not paid by the proper parties. But it being admitted that a certain number of miles were located in the district, it would be extremely technical and unreasonable to hold the assessment to be of such a void character, because of the omission aforesaid, that it could not be referred to, at least to show that a challenged debt was actually contracted within the limitation upon the debt-contracting power of the district.

It ought to be presumed that the district contracted with reference to its entire taxable valuation, and to permit it to avoid a debt honestly contracted, on the ground asserted, would be unjust and inequitable under the agreed facts.

The statutory evidence is the last assessment for territorial and county taxes. The assessment was in all respects valid for such taxes. That was the assessment considered by the court, and upon which the findings were founded. It was evidently intended in specifying that particular assessment in the statute, to ignore as a guide to the taxable value any special assessments that might be provided for by law. The assessment for territorial and county taxes was made the criterion in ascertaining the taxable value of city or town property in determining the extent of the power of such municipalities to incur indebtedness; yet a city or town might make a separate assessment of city or town property for local taxation, and were usually authorized to do so. If any question arose respecting an alleged over indebtedness of any such city or town, the assessment for territorial and county taxes would be the test as to value of taxable property; and doubtless it would be necessary by parol evidence to show what part of the property embraced in such assessment was located within the city or town. Under our system of assessing for taxation, we doubt if the territorial and county assessment would on the face thereof disclose definitely, outside of real estate, the property within each city or town in the county. Take horses, or cattle, moneys and credits, and the like; such property

is usually assessed by the county assessment to the individual owner without stating whether located in a town or city, or elsewhere in the county. Would it not be necessary in ascertaining the taxable value of city or town property by the assessment for territorial and county taxes to resort to extraneous evidence to show all the city or town property included in such assessment?

Now, the basis of the limitation was the value of the taxable property within the district. The assessment was designated as the conclusive and only evidence thereof. Admitting the existence of the taxable property in the district, how is any violence done the statute by ascertaining the value from the particular assessment made by the statute the evidence of such value? The law required the County Commissioners to levy the specially voted school district taxes upon the assessed valuation of railroad and telegraph property in the district as assessed by the territorial board. (R. S. 1887, Sec. 3966.)

5. The trial court correctly found that the issuance of the warrant was not the incurring of a new or original liability, and that the indebtedness was incurred at the time of the purchase of the steam heating apparatus, not later than August 25, 1886, the date of the contract, and that it, together with the existing indebtedness, did not exceed the prescribed debt limit. In so finding the court properly excluded from consideration the debts incurred subsequent to the date of said contract. The financial situation of the district on that date, as shown by the agreed facts, was as follows:

Indebtedness—School house bonds, $25,000; outstanding warrants against so-called contingent fund, $1,149; contract for the steam heating plant, the amount of which is represented by the warrant in suit, $2,650; total, $28,801. Four per centum upon the value of the taxable property amounted to $28,960.60. Hence the debt was entirely within the limit. But in addition to this there was on hand a balance in the teachers' fund of $1,383.36 at least, but it

would seem that said balance was $2,532.36, for the report of the treasurer at the annual meeting in May, 1886, from which the balance is ascertained, apparently charged against the receipts the outstanding warrants of $1,149, thereby rendering the balance as $1,383.36. If the sum of $1,149 represented unpaid warrants, there would have been $2,532.36 on hand. And, further, the annual meeting of the district in May voted a tax of $1,500 for contingent expenses, which the court held, correctly, we think, might have been anticipated by the district, since it would not be collected until later in the year.

Even if the date of the warrant should be treated as the date of the indebtedness, the total debts at that date amounted to $29,225.79; and by deducting therefrom the tax of $1,500, there would be left $27,725.79, an amount within the debt limit.

6. The school board were authorized by law to transfer moneys from the school house fund to the teachers' fund whenever satisfied that the same was not required to build a school house or furnish or repair the same, and in like manner to transfer a surplus of the teachers' fund to the school house fund. (R. S. 1887, Sec. 3930.) Hence a balance in the teachers' fund might have been available by transfer for expenditures in building, repairing or furnishing school houses, if found necessary and ordered by the board.

In this connection it might be said that but two school district funds were recognized by statute, viz: the school house fund and the teachers' fund. (R. S. 1887, Secs. 3930, 3960, 3961, 3964.) In this respect this court, when the case was here before, seems to have been led inadvertently into referring to the contingent fund as something distinct from the funds above named. Section 3961 above cited provided that "the school house fund shall consist only of taxes collected in the district; and all other school moneys belonging to the district shall go to the teachers' fund." Section 3964 provided, among other things, that "the Coun-

ty Treasurer shall at all times hold, subject to the draft of the proper officers, all moneys belonging to teachers' or school house fund." It is evident that the special taxes voted by a district for any purpose other than to supply a deficiency in the teachers' fund became rightfully, when collected and turned over to the district, a part of the school house fund. No other fund than the two were named or seem to have been contemplated by the statute.

School taxes were and are levied and collected by the county authorities, and paid over to the district treasurers. A general tax was and is required to be levied for school purposes on all taxable property in the county, to be divided, as provided by law, between the various districts in the county; and special district taxes might and may be voted at the annual district meeting for certain specified purposes. It is true that, in the specification of those purposes, the statute provided: "To vote such sum of money as the meeting shall deem sufficient for any of the following purposes: To supply any deficiency in the fund for the payment of teachers; to purchase or lease a suitable site for a school house or school houses; to build, rent or purchase a school house or school houses, and to keep in repair and furnish the same with the necessary fuel and appendages; for procuring libraries for the schools, books and stationery for the use of the board and district meetings; for purchasing books for indigent scholars, and to defray all other contingent expenses of the district." But this section did not in itself name the separate funds.

This matter becomes pertinent upon the consideration of the fact that the warrant in controversy was drawn upon the contingent fund. The district may have improperly kept such a fund separate from the others, but such action, we think, was clearly unwarranted by the statute. The taxes voted for contingent expenses would properly go into the school house fund, and any fund kept as a contingent fund, so-called, should be regarded as a part of the school house fund. Out of moneys in that fund the indebtedness

in question would be properly payable; and the fact that it was drawn as against "contingent fund" should not prevent its payment out of the proper fund, but it should be treated as drawn against the school house fund. (Dakota County v. Bartlett (Neb.), 93 N. W., 192; Kane v. Hughes County (S. D.), 81 N. W., 984.) In these cases it was held that an allowance of a claim and the drawing of a warrant against the "advertising fund" was equivalent to an allowance and drawing the warrant upon the "general fund," which was the appropriate fund for payment, there being no such a fund recognized by the statute as an advertising fund.

7. It is further contended that the district board was without power to contract or incur the indebtedness, for the reason that no funds for the payment thereof had been provided by the district. This contention seems to be supported by the opinion on the former appeal. We think it evident, however, that some facts now brought prominently into the case were not then before the court.

By an act of the Territorial Legislature approved February 18, 1886 (R. S. 1887, Secs. 4007-4019), it was provided in the first section that the board of directors of School District No. 3, in the County of Carbon (the district in question), are authorized to build or cause to be built a school house in the town of Rawlins in said district; and for that purpose are authorized to issue the district bonds for any sum not exceeding twenty-five thousand dollars, and that said school house shall be built and the bonds issued only under and by the provisions of that act. The following section named a building committee of five persons with authority to superintend the construction of the school house, to receive or reject bids and make contracts for the building of the same, to prepare and sell the bonds, and to carry out such plans and instructions as may especially come within the authority of the board of directors of the district. The first section authorizing the building of the school house contained this proviso: *"Provided,*

That the qualified electors of said school district shall so elect and determine at any regular or at any special meeting held for that purpose."

The building committee were given authority by said act to settle upon plans and specifications for the proposed school house, and to let the contract or contracts to the lowest responsible bidder.

It appears that at a special meeting of the district held March 6, 1886, duly called for that purpose, the electors thereof duly and regularly elected and determined to build or cause to be built a school house as provided in the act, and to issue the district bonds in the sum of $25,000 for the purpose named in the act aforesaid. The bonds were issued in June, 1886, sold at a premium, and all the moneys realized therefrom were expended by the building committee in the construction of the building and incident expenses, except a balance of fifty dollars paid over to the district treasurer.

The contract for the building, without heating plant, was awarded at the sum of $23,850, May 12, 1886, when all the bids were opened; the committee having previously advertised for bids for the construction of the school house and for putting in the heating apparatus, both together and separately, so that a contract for the building and the heating plant might be awarded to one person or separately. The said committee decided at the time the bids were opened to heat the building by steam, but did not then make a contract therefor. One of the bids opened was from the A. L. Strang Co. for the heating apparatus, at the price of $2,525.

In the meantime the annual district meeting had been held, viz: on May 3, 1886, at which meeting the electors voted a tax of $1,500, for the contingent expenses of the district, and no other special tax, and *also voted that all the powers of the meeting be delegated and vested in the board of directors of said district for the year next ensuing.* When the annual meeting was held, therefore, the cost of constructing the building either with or without heating apparatus had not been ascertained.

At a meeting of the school board June 7, 1886, it was voted and ordered that the building committee be given full power to let contract to the lowest responsible bidder for heating apparatus and to contract for putting in the same, and that the board would issue warrants of the district therefor.   On July 6, 1886, the building committee instructed its secretary to correspond with the Strang Company regarding the heating plant, and on July 26, 1886, said committee directed its secretary to inform said company that their bid was satisfactory, and that the school board would sign a contract for the same.   August 9, 1886, the building committee voted and ordered that the school board be requested to contract with the said company to put in a steam heating apparatus in the new school house, payments to be made in warrants, and certain changes were then ordered in the heating specifications, which accounts for the slight increase in the price over the original bid of the company.   August 25, 1886, the contract was entered into, being signed for the board by the director and clerk, it being agreed on their part to pay the contract price in school warrants of the district, to draw interest at eight per cent per annum.   The building was completed and occupied for school purposes in October, 1886, and it is to be understood that the heating apparatus had then been placed in the building according to contract by said A. L. Strang Company.   Thereafter the warrant was issued, and the payments made thereon from time to time as set forth in an earlier part of this opinion.

At the annual meeting of the electors of the district, May 5, 1890, it was regularly voted and ordered that the sum of two thousand dollars be voted as a special tax for contingent fund—one-half of which should be used to pay the then outstanding indebtedness of the district.   And June 3, 1890, the then clerk of the board wrote the holder of the warrant in suit to the effect that the district had voted one thousand dollars on account of indebtedness which would be available about November 30, 1890.

Thus we find that, under direct authority of the Legislature and the school district electors, a building committee specially designated for that purpose had selected plans for a school house and caused the same to be constructed, evidently purposing to keep within the bond issue, but that after the annual district meeting it was discovered that the building could not be provided with a suitable heating plant without exceeding the proceeds of the authorized bond issue. It may be reasonably assumed from the cost and nature of the structure, as well as the purpose for which it was designed, that a plant to heat the same by steam or in some similar manner was not only desirable, but almost necessary. Certainly it was necessary to provide for its heating by some method; and if it was beyond the power of the board or district then to incur additional expense, the building would for some considerable time be kept in a condition unfit for occupancy. There was then no general statute for the issuing of bonds; and the Legislature would not again regularly convene until 1888. There is no contention of fraud or unfairness in the transaction. The contract appears to have been well considered and to have been entered into in good faith. Still, if the power to make the contract was lacking, and the act of the board was *ultra vires,* it must be so held. This question must be determined by reference to the statutes then in force.

We are not materially aided in this matter by reference to the decided cases in other states, owing to the dissimilarity of statutory provisions. In many of the states the decisions denying a kindred power have largely turned upon a provision absent from our laws, to the effect that the school board may build school houses "out of funds provided for that purpose." The general authority of the board in this state is expressed as follows:

"The district board shall make all contracts, purchases, payments and sales, necessary to carry out every vote of the district, for procuring any site for a school house, renting, repairing or furnishing the same, and disposing thereof, or

for keeping a school therein, and performing such other duties as may be delegated to them by the district meeting." (R. S. 1887, Sec. 3936; R. S. 1899, Sec. 540.)

"They shall audit and allow all just claims against the district, and the directors shall draw an order for all demands thus audited, on the district treasurer." (R. S. 1887, Sec. 3941; R. S. 1899, Sec. 546.)

There is a significant provision in Section 3946 of the Revised Statutes of 1887, which is Section 551 of the revision of 1899, which may in a slight measure, perhaps, aid in the interpretation of the powers conferred by the other sections. It is there provided that when it has been determined by the board and County Superintendent to establish a school of a higher grade, "the board may erect, for the purpose, one or more permanent school houses, . . . but in selecting the site for such school house or school houses, the permanent interest and future welfare of the people of the entire district shall be consulted." That section, in substantially its present condition, has always been a part of the school law, having been included in the original act passed in 1869. (Laws 1869, p. 228.)

The school district is by law declared a body corporate, and as such is empowered to hold property, and be a party to suits and contracts. (R. S. 1887, Sec. 3925; R. S. 1899, Sec. 529.) The powers granted to the district electors in meeting assembled have suffered but slight change since the enactment of the first school law in 1869. Those powers as they existed in 1886, so far as material to this controversy, included the right to determine the number of schools to be established, and the length of time each shall be taught; to fix the site of each school house; to vote such sum of money as the meeting shall deem sufficient for certain specified purposes, which have been set out in an earlier part of the opinion, including generally supplying a deficiency in the teachers' fund, purchasing school sites, building, renting, purchasing or repairing school houses, and furnishing them with necessary fuel and appendages, pur-

chasing libraries and defraying all other contingent district expenses; to direct the sale or other disposition of any school house or the site thereof, and of other district property, and the application of the proceeds thereof; and to delegate any or all those powers to the district board. (R. S. 1887, Sec. 3927.)

As the law stood in 1886, the power to vote money was subject to a *proviso* limiting the sum voted to a certain number of mills on the dollar of the taxable property of the district. The original act contained no such limitation, but the county board was authorized to increase or diminish the aggregate amount of school district tax as might be deemed proper. (Laws 1869, Ch. 7, p. 231; Comp. L. 1876, p. 529.) In 1890 the power of delegation to the district board was amended by providing that the board should not be authorized to vote or raise money; in other respects the power was continued. In voting money the district meetings were required to designate the respective objects thereof, and the amount to be raised for each object. (R. S. 1887, Sec. 3928.)

In addition to the facts already mentioned, it was agreed in the statement of facts that during the entire year 1886 the district owned property worth $2,200, not used or required for school purposes after the completion of the new school building; and that the report of the treasurer at the annual meeting in May showed a balance of money on hand in the teachers' fund of $1,383.36, and there is nothing to show that such balance was lessened before the contract of August 25, but it is agreed that on October 30, 1886, the teachers' fund was overdrawn in the sum of $71.74 by reason of outstanding warrants against the fund, without any statement of the date of such warrants. The treasurer's report was made up by showing the receipts amounting, with the money on hand at the last preceding annual meeting, to $5,617.36, and charging against them the expense of teachers' fund, $3,085, and of contingent fund, $1,149. But as the amount charged as expense of

contingent fund is the precise amount of unpaid warrants then outstanding against the fund, it may be that the actual balance of money on hand was greater than that shown by the report, since the expense charged up may have been represented by the outstanding warrants. At any rate there was a balance of $1,383.36 in the teachers' fund presumably remaining intact until the making of the contract, and there was unused school property, or property which would be out of use upon the completion of the new building worth $2,200, and the special tax of $1,500 had been voted for contingent expenses, making a total of $5,083.36, against which were outstanding warrants amounting to $1,149, leaving a balance of $3,934.36 of possible funds out of which to pay the contracted indebtedness for the heating plant of $2,650.

The district meeting had delegated all its powers to the district board, thus authorizing it to sell and dispose of the unused property, and direct the application of the proceeds; and the board was empowered by statute to transfer money in the teachers' fund to the school house fund; and it is evident that the board might have lawfully contemplated the exercise of such power in executing the contract of August 25. And it is also evident that had the district electors at the annual meeting anticipated a deficiency in the bond fund to thoroughly complete the new building, they might have regarded the tax of $1,500 sufficient in addition to the above mentioned resources.

There was, moreover, an additional available resource of the current year. The statute imperatively requires the county board to levy upon all property in the county each year a tax for general school purposes, to be divided among the various school districts in a specified manner. That tax when collected goes into the teachers' fund; but if not all required for the purposes of that fund, the board had authority to transfer the surplus into the school house fund. Now, nothing is shown relating to the necessities of the district as to that fund. True, the fund was overdrawn on

October 30, 1886, but the current taxes would not then in due course have all been collected. So far as the record discloses, the board may in fact have transferred money from the teachers' to the school house fund, and paid other bills therefrom on account of the furnishing of the building. Neither is it shown whether or not the unused property was in fact sold.

Upon a casual reading of the opinion in Davis v. Board, 38 W. Va., 382, the case might appear to hold it improper to consider the agreed value of unused school property in estimating the available funds at the disposal of the board. But it is evident that a different statute was there involved. The law of that state expressly prohibited any contract for the expenditure of more than the aggregate amount of the district's quota of the general school fund, the tax levies for the year, any balance in the sheriff's hands from the preceding year, and tax arrearages; thus making no allowance for unsold school property; and the other statutory provisions were different from our own.

It would be necessary to resort to several presumptions which we think would be unauthorized to hold as an established fact that the contract was in excess of the available current funds. The objection, therefore, that the contract was void because it involved an expenditure beyond the appropriation for the purpose does not seem to be well taken.

The fact that, subsequent to the contract, the board ordered and bought furniture for the new school house cannot operate to avoid the heating contract. A heating plant was obviously as much, if not more, necessary than the furniture. The district doubtless owned furniture in the old building, and clearly the building would require heating before there would be much use for furniture to accommodate teachers and pupils.

We need not decide whether, under the law as it stood at the time, the board would have been empowered to raise money by voting a tax, under the general delegation of the

powers of the district meeting, although had they such power there might have been raised, in addition to the $1,500 tax, within the special tax limit, the sum of $672.

It does not appear that the board sold the unused property, or that it made any transfer of funds; but that fact is not important. It might have done so; and we are now considering its resources at the time of contracting the indebtedness, upon the objection that it exceeded the amount of funds at its disposal. In the opinion upon the former appeal, the delegation of the district meeting powers does not seem to be referred to, nor does the fact that there was unused property seem to have been shown;' and by inadvertently mistaking the nature of the so-called contingent fund, it was considered impossible for a transfer to that fund of money in the teachers' fund. This doubtless accounts for the opinion then expressed respecting the ordinary powers of the board in the premises.

But we think the question is capable of determination upon even broader grounds. Whatever may be the proper construction of the section defining the general powers of the school board, by the action of the electors at the annual meeting the board became vested with all the powers of that meeting, and hence with all the powers of the district to contract the debt in controversy.

At the time of the annual meeting in 1886 there existed no statute directly placing a limitation upon school district indebtedness, and the act of Congress of July 30, 1886, only limited such indebtedness to four per centum on the value of the taxable property in the district, which, as above shown, was not exceeded by this debt. It is true there was no express statutory provision authorizing a school district to incur a debt, but neither was there a provision prohibiting a debt or contract in excess of the revenue or taxes for the current year; nor, unlike the statutes of many of the states, was there a provision authorizing the board to build or furnish school houses only out of funds provided for that purpose.

Upon that condition of the law, we think that the district had authority to incur a reasonable debt for a legitimate and necessary purpose. Otherwise it might have been totally unable to provide suitable accommodations for school children. By reason of unforeseen circumstances, repairs might have become necessary at an expense beyond the current year's revenue. In the case at bar a new building was in course of construction under positive authority of the Legislature, and the district electors, and it does not appear that the building as planned was beyond the necessities of the district, or of unreasonable size or cost in proportion to the local requirements.

Had the fact been ascertained at the time of the annual meeting that the bond proceeds would fall short of the amount required to install a suitable heating plant, and properly furnish the building, the district would have had power, in our judgment, to authorize the contract in question, and the issue of warrants to pay the obligation incurred.

Considering the character and duties of such a corporation, and the important interests under its control, it could not have been contended successfully that the equipment of the new building with the heating apparatus was either an unreasonable or extravagant expenditure. We suppose that an expense so large as to be entirely outside the reasonable wants of a particular district and of such a character as to show unreasonable extravagance or fraud might have been restrained. But there is not the slightest indication here of any such condition. A new school house presumably required for the accommodation of the district required some suitable heating arrangements to render it fit for occupancy. The district, and the board under the delegation of authority, if not without it, had undoubted power granted by the Legislature generally to build, repair and furnish school houses, and this particular building by special legislative enactment. And as the provision made by the challenged contract was clearly reasonable, and as

clearly necessary, the power to incur the indebtedness was in our judgment incident to the power to provide the heating apparatus; since such indebtedness was not inhibited by any express provision of statute, nor, we think, by necessary implication. Mullarkey v. Cedar Falls, 19 Ia., 21; Hanna v. Wright, 116 Ia., 275; Conklin v. School Dist., 22 Kan., 521; Hemme v. School Dist. (Kan.), 1 Pac., 104.) As was said by Mr. Justice Brewer in Conklin v. School District, *supra,* although the powers of a school district are few and limited, "a reasonable construction must be given to the powers which are granted."

Whatever powers the district possessed in the premises having been lawfully delegated to the board, it is clear that the latter was vested with the complete power of the district to provide the heating plant and incur the debt therefor. We are of the opinion, therefore, that the debt was not void as beyond the power of the district or board.

8. Section 3938, Revised Statutes of 1887, provided: "Whenever any school house is to be built or any repairs, addition or improvement costing more than two hundred dollars made to any school house or district property, the board of directors of the district shall advertise for bids for such work, and in all cases contract the same to the lowest responsible bidder." The same provision is continued in our statutes. (R. S. 1899, Sec. 543.) It is admitted that the board did not advertise for bids for the heating apparatus. But it is also admitted that the building committee, appointed by the act of the Legislature aforesaid, did advertise for such bids at the same time that they advertised for bids for the construction of the building; and it is not contended that the contract was otherwise let than to the lowest responsible bidder. The act empowered the committee, among other things, "to carry out such plans and instructions as may especially come within the authority of the board of directors of said district." The school board by vote of that body authorized the committee to let the heating plant contract. The committee possessed

undoubted authority under the act to advertise for the bids when they did so advertise; and the fact that the funds at their command were exhausted by the expense of the building without the heating apparatus should not be held to invalidate their advertisement, and render it imperative for the board to again advertise. The purpose of the statutory requirement was complied with, if indeed the compliance was not literal, taking the two statutes together. We are not inclined to accept the technical construction contended for. The advertisement of the committee was accepted by the board, as well as its award of the contract; and in this respect the two bodies—board and committee—combined in the award. There was a sufficient advertisement for bids to authorize the contract.

9. Assuming the power of the district to have originally authorized the purchase of the heating plant and the incurring of the debt, it might ratify it. (McGillivray v. Sch. Dist., 112 Wis., 354.) And we think the action of the district meeting in 1890 in voting a tax of two thousand dollars for contingent expenses, one thousand dollars of which was expressly voted to apply upon existing indebtedness, amounted to a ratification of this debt, for the record fails to disclose any other outstanding indebtedness at the date of such meeting, except presumably the bonded indebtedness, which, however, was otherwise provided for, and the vote aforesaid obviously did not refer to the bonds.

10. The contention that there is no authority to render a general judgment against the district cannot be sustained. The fact that an execution against the district property could not be issued upon the judgment does not prevent its rendition. Rendering judgment is one thing; enforcing it is another. There may be other means of enforcing the judgment than by levy of execution. The authorities cited in support of the contention are inapplicable. The case of Moody v. Cass Co., 74 Mo., 307, was where a county warrant was issued upon the "road and canal fund," a fund incapable of increase by the county authorities through tax-

ation or otherwise; and the court said: "A party cannot do work for a county and agree that he shall be paid out of a fund which the county has no means, either of increasing or replenishing, and in the event of the exhaustion of that fund, resort to other funds." In Campbell v. Polk Co., 76 Mo., 57, the warrant was drawn on a fund that was exclusively the bounty of Congress, which the county could not replenish. People ex rel. Wood, 71 N. Y., 371, was a suit in mandamus to compel the payment of a claim against a village. The writ was denied for one reason, because there appeared to be no money in the fund from which the claim was payable, and no means provided for replenishing the fund.

The cases above referred to illustrate the point. The warrant here involved was payable from the school house fund, although drawn against an imaginary contingent fund. That fund was a continuous fund, though at times it might be exhausted, and it was capable of being replenished by a transfer of funds, or by annual taxation. Warrants drawn upon it when temporarily exhausted would be entitled to payment, in their proper order at least, whenever the district received money properly credited to the fund. The debt represented by the warrant having been lawfully contracted, and the warrant properly issued, we perceive no sound reason why a judgment for the amount due thereon may not be rendered. It is not necessary to consider questions that may arise upon an attempt to compel its payment.

All the objections urged against the judgment having been thus considered, we are unable to find that any error was committed, and for the reasons stated the judgment will be affirmed.                                      *Affirmed.*

Beard, J., concurs.